ANNIE McCARTHY, DEFENDANT IN ERROR, v. METRO-
POLITAN LIFE INSURANCE COMPANY, PLAINTIFF IN
ERROR.

Submitted November 29, 1907—Decided March 2, 1908.

1. Where fair-minded men might honestly differ as to the conclusions
to be drawn from facts, whether controverted or uncontroverted,
the question at issue should go to the jury.
2. In an action on a policy of life insurance, the defence being in-
tentional poisoning, either by the insured or the beneficiary, it
appeared that insured was a·laboring man much older than his
wife; that he worked at night, and that shortly after his usual
midnight supper, prepared by the wife, he was seized with cramps,
diarrhœa and vomiting, which are symptoms of arsenical poison-
ing, and died after an illness of about three days, an autopsy dis-
closing sufficient arsenic to cause death. Less than a month be-
fore death he had taken out a policy upon his life for $2,000,
payable to his wife as beneficiary, and of which she knew. In
view of these and other circumstances appearing in the evidence—
*Held,* that the direction of a verdict against the company was
error.

On error to the Supreme Court.

For the plaintiff in error, *Willard P. Voorhees.*

For the defendant in error, *John A. Coan* and *George S.
Silzer.*

The opinion of the court was delivered by

PARKER, J. This is an action on a policy of life insurance,
the defendant·in error, plaintiff below, being the widow of
the insured and the beneficiary named in the policy. The
action of the trial court assigned for error was the direction
of a verdict for the plaintiff, counsel of the company insisting
that the case should have been submitted to the jury.

The defendant company pleaded specially—*first,* that the
insured had died of poison intentionally self-administered,
and *secondly,* that the beneficiary had caused the death of the

insured by poison, with intent to defraud the company. In support of these defences evidence was given tending to show the following facts: That deceased was a laboring man, a coal trimmer, working at night at the South Amboy coal wharves. He was forty-five years of age, his wife twenty-six. He had four industrial policies, on which the weekly payments aggregated fifty cents. On May 17th, 1905, the policy in question was issued, in amount $2,000, premiums payable quarterly, $27.84 each. There was evidence that the wife knew of this, as she had to sign some paper relating to amendment of the policy. Only the first quarterly premium was paid, as he died on June 14th, 1905, less than a month after delivery of the policy. On the night of the 11th of June deceased went, as usual, to his work at six o'clock, returning home at midnight, in accordance with his regular custom, to eat his supper, prepared usually for him by his wife. No question was raised as to who prepared it that night, and no unusual circumstances appeared. Deceased was in good health that night until some two or three hours after he had eaten his supper, when he was taken sick with diarrhœa and vomiting, which the testimony showed were symptoms of arsenical poisoning. He spoke of some water that he had been drinking, but nothing further appeared about that. Being unable to continue his work, he went home about four A. M. with his brother-in-law, and the next morning a physician was called in, who prescribed as for a case of gastritis and malaria. Another physician was called in the next day, and both found the same symptoms of diarrhœa, pain in the stomach, nausea and aching all over, all characteristic of arsenical poisoning. Neither physician prescribed any arsenic. One witness heard him ask his wife for a drink of water, and heard her say to him in reply, "Why don't you die like any man?" After his death and burial the body was exhumed and an analysis made of the viscera, resulting in the discovery of quite sufficient arsenic to cause death.

All these matters were testified to without substantial contradiction. The widow was not sworn as a witness.

We think that in view of this evidence there was error in the direction of a verdict for the plaintiff. There was ample evidence to justify a jury in finding that deceased died of arsenical poisoning. The question would then be, How did such poison enter the system? And the answer to this must be left to inference from facts and circumstances given in evidence, and which the jury might consider fairly proved. It seems to us to be clearly a jury question whether the arsenic was in the supper that he ate. There is no reason for supposing it to have been in the water. If it was in the food, a natural inference would be that the wife put it there—perhaps accidentally, but not probably so. Her answer to his request for water was evidential as to her state of mind. A witness who heard this answer testified that it seemed to be in joke, but as to this the jury should decide, and the very recent issue of an insurance policy upon the husband's life, payable to the wife, and of which she had knowledge, is significant as evidencing a motive for the alleged crime. 21 *Am. & Eng. Encycl. L. (2d ed.)* 215.

We think the evidence adduced fairly raised an issue of fact, as to poisoning by the wife, if not indeed the further issue of intentional self-poisoning, which the jury should have been allowed to pass upon. Poisoning is a crime easy to conceal and difficult to discover, and much, in cases involving poison, must be left to inference and circumstantial evidence, even in criminal cases. But no question of reasonable doubt was here involved, nor could a finding for the defendant be in any way prejudicial to the claimant if prosecuted criminally. The jury would have passed on it as a pure question of preponderance of evidence, and might well have decided that it was not proved, but the case, in our opinion, was clearly within the province of the jury. A verdict is properly directed when the facts are not in dispute, and the inferences from them not in doubt, the question at issue being then one of law only. *Belcher* v. *Manchester Building and Loan Association,* 45 *Vroom* 833. But where fair-minded men might honestly differ as to the conclusions to be drawn from facts, whether controverted or uncontroverted,

the question at issue should go to the jury.  *Bennett* v. *Busch,*
*ante* p. 240.

For this error of the trial court the judgment must be
reversed and a *venire de novo* awarded.

*For affirmance*—VROOM, J.    1.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, GARRI-
SON, SWAYZE, REED, TRENCHARD, PARKER, BERGEN, BOGERT,
GREEN, GRAY, DILL, J.J.    12.